# In the United States Court of Federal Claims

|  |  |
|---|---|
| RULIERE THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )    No. 22-590C |
| v. | )    (Filed: February 13, 2025) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Wojciech Z. Kornacki, Pentagon Law Office, Washington, DC, for Plaintiff.

Stephen J. Smith, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were, Steven J. Gillingham, Assistant Director, and Patricia M. McCarthy, Director, for Defendant. Maj. David Chewning, Military Personnel Litigation Branch, The Judge Advocate General's Corps, United States Air Force, Joint Base Andrews, MD, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Chief Judge.**

The plaintiff in this case, Ruliere Thomas, served in the military on active duty for almost eighteen years, first with the United States Army, then with the United States Air Force Reserve ("AFR"), and finally with the United States Air Force Active Guard Reserve ("Active Guard Reserve" or "AGR"). His active-duty service ended in May 2016 when, based on the decision of the Active Guard Reserve Review Board (the "AGR Review Board"), his request to be retained was rejected, and he was involuntarily separated from the AGR, just a few months before he would have reached "sanctuary" status under 10 U.S.C. § 12686.[1]

About a year after Mr. Thomas separated from the AGR, he was diagnosed with service-connected post-traumatic stress disorder ("PTSD"). He subsequently filed an application with the Air Force Board for Correction of Military Records ("AFBCMR" or "the Board") requesting his records be corrected to reflect that he was medically retired based on disability. After the Board

---

[1] Under 10 U.S.C. § 12686, "a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay under a purely military retirement system . . . may not be involuntarily released from that duty before he becomes eligible for that pay, unless the release is approved by the Secretary." Mr. Thomas would have been eligible for retirement pay after twenty years of active-duty service. See 10 U.S.C. §§ 12731–32.

rejected his application, Mr. Thomas filed the present action on May 31, 2022. Compl., ECF No. 1.

At the parties' request, the Court remanded the case to the Board on August 31, 2022, with directions that it evaluate all of Mr. Thomas's claims, including his challenge to the AGR's decision not to retain him for an additional term at the end of May 2016. Remand Order, ECF No. 8. On remand, the Board found that Mr. Thomas was not entitled to disability retirement based on PTSD. Admin. Rec. ("AR") 2–20. It also upheld the AGR Review Board's denial of his request for retention and rejected Mr. Thomas's contention that the Air Force improperly cancelled his appeal of the AGR Review Board's determination. Id.

The case is now before the Court on the parties' cross-motions for judgment on the administrative record. Mr. Thomas contends that the Board erred in finding that he was not unfit for duty based on his PTSD at the time of his separation. He also challenges the substance of the AGR Review Board's decision to deny his request for retention, and argues that the Air Force violated Air Force instructions when it cancelled his appeal of the AGR Review Board's non-retention decision.

For the reasons set forth below, the Court concludes that:

1. The Board's determination that Mr. Thomas was not unfit to perform the duties of his office, grade, rank, or rating because of service-connected PTSD was arbitrary, capricious and contrary to law because the determination does not reflect application of the principles of "liberal consideration" required by Department of Defense ("DoD") guidance and 10 U.S.C. § 1552(h)(2), and is not supported by substantial evidence;

2. Mr. Thomas's challenge to the substance of the AGR Review Board's non-retention decision is nonjusticiable; and

3. The Air Force violated its own regulations when it cancelled Mr. Thomas's appeal of the AGR Review Board's non-retention decision.

Therefore, Mr. Thomas's motion for judgment on the administrative record ("Pl.'s MJAR"), ECF No. 28, is **GRANTED**. The government's cross-motion for judgment on the administrative record (Def.'s MJAR), ECF No. 31, is **DENIED**. The case is remanded to the AFBCMR for further proceedings consistent with this opinion.

## **BACKGROUND**

### I.    Factual History

#### A.    **Mr. Thomas's Deployments to Iraq in 2003 and 2009**

Mr. Thomas enlisted in the United States Army in 1995. AR 122. In 2006, he was honorably discharged from the Army after 11 years, 4 months, and 4 days of active-duty service.

AR 122, 177. During his time in the Army, Mr. Thomas was deployed to Iraq, where he was engaged in combat during Operation Iraqi Freedom. See AR 56, 122.

In 2006, Mr. Thomas enlisted in the Air Force Reserve. AR 23. He was again deployed to Iraq between 2009 and 2010, where he again served in a combat role. AR 179.

During his first deployment to Iraq, Mr. Thomas suffered a number of highly stressful combat-related experiences. For example, he witnessed his friend's decapitated corpse, "learned of another friend's death after having been shot down while flying a [] helicopter over Fallujah," was ambushed in a convoy and placed "under rocket attacks and gunfire," experienced "nightly firefights, ambushes, and rocket attacks" as well as "daily, high speed pursuits and evasion tactics," and encountered a woman wearing a suicide vest. AR 272–73. According to Mr. Thomas, upon his return from Iraq in 2004 he started to experience symptoms consistent with PTSD. These included mood swings, flashbacks, and hypervigilance. AR 159. He also stated that his symptoms affected his ability to perform his duties. Id.

Mr. Thomas's assertions are supported by others who served with him. For example, in a 2004 email, First Sergeant Nesmith advised Captain Hamrick (presumably one of Mr. Thomas's superiors), that Mr. Thomas told him he "was overwhelmed by military life and that he needed to get out of the military." AR 31. Mr. Nesmith noted that he was monitoring Mr. Thomas "on almost a daily basis" in order "to make sure his current state of mind does not cause or pose a safety [risk] to him [or] his soldiers." Id.; see also AR 283 (a service member's letter asserting Mr. Thomas was "[n]on-deployable" in 2004); AR 284 (a service member's report that Mr. Thomas "showed signs of stress," "was having trouble sleeping," and "didn't trust anyone" after they returned from deployment).

Mr. Thomas's sisters and wife described similar changes in Mr. Thomas's behavior and mental status after his first deployment to Iraq. One sister observed that "[e]verything was fine until his deployment to Iraq in 2003." AR 288. She stated that he came back "a completely different person." Id. On multiple occasions, she observed him "in a large conversation with himself," and "repeating himself," but "the worst thing [was] he became really hypervigilant." Id. She reported that his hypervigilance led him to "w[a]ke up in the middle of the night" and "search[] the entire apartment" because "[h]e told [her] that someone was running after him and wanted to kill him." Id.

Another sister reported he was no longer able to stay focused, he became insensitive, impulsive, and confused, and she no longer enjoyed his visits to her home because she and her family "fear[ed] his presence." AR 289. She reported that because of his yelling and threatening behavior, her children would hide in their rooms when Mr. Thomas visited. Id.

Mr. Thomas's wife detailed that when Mr. Thomas came back from his first deployment to Iraq "he was not sleeping through the night, seemed to always be on guard, and was very aggressive." AR 290. She recalled that during the first week after his return in 2004, after their three-year-old son tried to crawl in bed on Mr. Thomas's side, Mr. Thomas "pinned [him] to the floor by the throat before [she] could react." Id.; see also AR 23 (Mr. Thomas's written statement). "He still struggled at work and was very aggressive at home," his "moods change[d]

quickly," and she and their children "felt as if [they] were walking on eggshells with him." AR 290. These behaviors strained Mr. Thomas's marriage, leading to a temporary separation beginning in 2006. See id.

Mr. Thomas described similar symptoms of distress in January 2010 after returning from his second deployment to Iraq. AR 126, 326. In his post-deployment health assessment ("PDHA") he "reported constantly being on guard" and stated that he felt "watchful or easily startled," "detached from others," and "down, depressed[,] or hopeless." See AR 126.[2] His wife noted that "his behavior was similar to when he returned in 2004. He was very aggressive and was not sleeping through the night." AR 290. After a restaurant outing together, "he panicked because he could not find his weapon. It took several minutes to calm him down and get him to recognize that he was in Colorado." Id.

### B.     Mr. Thomas's Service in the Air Force Active Guard Reserve

After his second deployment to Iraq, Mr. Thomas was selected to serve in the Air Force Active Guard Reserve beginning in January 2011. See AR 119. The Air Force Active Guard Reserve is "a career program that may lead to an active duty [] retirement after attaining the required years of active Federal Military Service." Air Force Instruction ("AFI") 36-2132 Vol. 2 ¶ 1.1. "[I]nitial assignment length" in the program is generally 3 or 4 years. See id. ¶ 2.7.1. After an assignment ends, an AGR member can continue to serve if the AGR Review Board grants them an assignment extension, otherwise known as a retention. See id. ¶¶ 2.7.7., 4.1. Retention decisions are based "on the needs of the [Air Force Reserve]" taking into consideration "the individual's request and leadership recommendations." Id. ¶ 4.3; see id. ¶ 2.7.7. "Continuation is dependent on continued performance, career progression, the needs of the AFR and career field requirements." Id.

From 2011 to 2015, Mr. Thomas was assigned to the 439th Security Forces Squadron at Westover Air Base, where he held the positions of "Patrolman" and "Security Response Team Member." AR 70–75. Mr. Thomas's responsibilities in both positions consisted of "general force protection duties, including the use of deadly force, to protect personnel and resources." AR 70, 72, 74. His position also entailed acting as a first responder to accidents and other emergencies. Id.

The record shows that Mr. Thomas continued to exhibit symptoms consistent with PTSD throughout the period of his service with the AGR. Fellow service member Greg Vieira stated that during the time he worked with Mr. Thomas from 2012 to 2013, Mr. Thomas was "[hypervigilant] and would have brief moments where he would stare and flash back and end up sweating." AR 287. He also stated that when he first began to work with Mr. Thomas he was "briefed by one of [our] supervisors that when we conduct scenario-based training to stay away from Mr. Thomas." Id.

According to the psychological advisory opinion prepared for the AFBMCR, Mr. Thomas apparently "completed a web-based health assessment" "on October 20, 2012, and

---

[2] Though both psychological advisors to the Board described this PDHA, see AR 126, 326, the assessment itself does not appear in the administrative record before the Court.

August 3, 2013." AR 126.[3] The advisor alleges that he reported sleep problems and symptoms of depression, which he attributed to discrimination by his superior. Id. He "denied these issues presented any difficulties to him, but further assessment was recommended." Id. There are no records showing that further assessments were performed. Id.

### C.    The Non-Retention Decision and Appeal

During his tenure with the AGR, Mr. Thomas's service contract was extended twice. His initial contract was for three years, to expire on January 31, 2014. AR 23. He was awarded a one-year extension of this contract to January 31, 2015. AR 23–24. On April 27, 2014, his service was extended a second time, until January 31, 2016. AR 335. On March 25, 2015, the AGR Review Board denied his request for a third extension, leaving January 31, 2016, as his date of separation. AR 81, 256.

On June 16, 2015, Mr. Thomas appealed the AGR Review Board's decision to the Chief of Air Force Reserve ("AF/RE"), who is the "final appeal authority" for non-retention decisions of the AGR Review Board. AFI 36-2132 Vol. 2 ¶ 4.5; see also id. ¶ 1.2.1 (detailing the AF/RE's "[f]unctional [r]esponsibilities"). He sent an appeal package to his immediate superior, Master Sergeant Scott Taylor, with a copy to his commander, Lieutenant Colonel ("Lt. Col.") Wesley Thiel. AR 81–94 (appeal package); AR 192–93 (memorandum from Mr. Thomas to "HQ AFRC/DPA"). The next day, Lt. Col. Thiel forwarded the appeal to Major ("Maj.") Jason Somers of the Air Reserve Personnel Center. AR 82; see also AFI 36-2132 Vol. 2 ¶ 4.5.[4]

In his appeal memorandum, Mr. Thomas detailed his service history, including his deployments, and military and personal achievements. AR 85–86, 192–93. The appeal package was endorsed by Lt. Col. Thiel, who stated that he "HIGHLY recommend[ed]" that Mr. Thomas be given career status. AR 84. Lt. Col. Thiel observed that Mr. Thomas "excels at every facet of his job and is a model [noncommissioned officer]." Id. He further noted that Mr. Thomas led his unit in education and that "his maturity and experience level within the Security Forces career field and the unit would be difficult to replace." Id.

Lt. Col. Thiel also voiced his concern about the impact that the denial of Mr. Thomas's appeal could have on both Mr. Thomas and the morale of fellow reservists. He opined that "[a]s leaders, we would not be taking care of our Airm[e]n if the decision were to end their career at the 17.5 year point; knowing that they have dedicated the majority of their career in selfless

---

[3] Again, though one psychological advisor discusses this health assessment, see AR 126, it does not appear in the administrative record before this Court.

[4] AFI 36-2132 Vol. 2 ¶ 4.5.1 provides that an appeal of an AGR Review Board decision must be forwarded to a member's supervisor within 60 days of the date listed on the AGR Review Board decision memorandum. Mr. Thomas's appeal was sent to his commander 84 days after the date listed on the AGR Review Board decision memorandum. See AR 82, 256. The Board did not find that Mr. Thomas's appeal was late, and the government does not raise the issue in its briefs. Any claim that the appeal was untimely has therefore been forfeited. See Bullock v. United States, 10 F.4th 1317, 1320 (Fed. Cir. 2021).

service." Id. He emphasized that he could not "stress enough the importance of granting [Mr. Thomas] career status" because "[t]he decision to remove a member after that many years would have [a] significant impact to the morale of all members within the AGR program." Id.

### D.        The Command Directed Mental Health Evaluation

According to Mr. Thomas, on November 12, 2015, and with his non-retention appeal still pending, he was placed on a "Do Not Arm List" and relieved from regular duty. AR 24. He states that he was not told why he was placed on the list and did not believe he had committed any act that would require his command to disarm him. Id.

On December 10, 2015, about six weeks before his scheduled date of separation, Mr. Thomas was reassigned to a different unit ("Pass & ID") and continued on extended active duty with a new date of separation (May 31, 2016). See AR 310 (Special Order); AR 34. The extension was granted so that there would be time for Mr. Thomas to undergo a non-emergency "Commander's Directed Mental Health Evaluation" ("Commander Directed Evaluation" or "CDE") which had been ordered by Mission Support Group Commander, Colonel ("Col.") Karen Magnus. AR 310, 329; see also AR 260, 333.

CDE procedures are provided by paragraph 6.9 of AFI 44-172 (entitled "Mental Health"). A commander may order a service member to report for a CDE for a variety of reasons, including "fitness for duty, occupational requirements, safety concerns, significant changes in performance or behavior changes that may be attributable to possible mental status changes." Id. ¶ 6.9.3–6.9.4; Dep't of Def. Instr. ("DoDI") 6490 ¶ 3.b.–3.c. CDEs are administered by mental health providers who "complete a formal written response to the Commander or supervisor within one duty day following completion of the CDE." AFI 44-172 ¶ 6.9.5, 6.9.8. The providers "advise the commander or supervisor of any duty limitations or recommendations for monitoring or additional evaluation, recommendations for treatment, referral of the Service member to a Medical Evaluation Board [("MEB")] for processing through the Disability Evaluation System [("DES")] . . ., or administrative separation of the Service member for personality disorder or unsuitability for continued military service." DoDI 6490.04 encl. 3 ¶ 5.b.

Maj. Matthew Willerick, the clinical psychologist who conducted Mr. Thomas's CDE, reported that its purpose was to address "questions regarding behavioral changes that may be attributable to possible mental health status changes." AR 260. Maj. Willerick stated that Mr. Thomas had been exhibiting "increasingly bazar [sic] patterns of behavior that worsened after his retention package was initially declined." Id. These "[bizarre] patterns of behavior," according to Maj. Willerick, "led to repeated verbal counseling sessions and repeated paperwork." Id.

The paperwork to which Maj. Willerick refers, however, is not in the record. Nor is there evidence in the record to show that verbal counseling sessions were held or what was discussed during those sessions. Further, Maj. Willerick's report does not provide any details about the "increasingly [bizarre] patterns of behavior" that caused Col. Magnus to order the CDE. See id.

The only information in the record about Mr. Thomas's state of mind in the period leading up to Mr. Thomas's reassignment and Col. Magnus's order is contained in letters from

Mr. Thomas's wife and colleagues. His fellow service members describe incidents where Mr. Thomas's "usual jovial self, would be replaced with a quiet almost depressed state," AR 285, such that he sometimes "was not right mentally for [his] shift," AR 286.

Mr. Thomas's wife describes his mental state in greater detail in a June 22, 2020 letter. AR 290–91. She observed that "[d]uring the fall of 2015, it was evident that [Mr. Thomas]'s mental condition was deteriorating." AR 290. She explained that "he was not sleeping and seemed to be struggling with periods of depression that were lasting longer and longer." Id. Ms. Thomas stated that his "[b]eing placed on restriction and then sent for a mental health evaluation magnified the problems at home." Id. She characterized his reactions as "swift and aggressive" and recalled that "[h]e was not sleeping through the night and many times it seemed that he was patrolling our home during the night like he was concerned that someone was threatening us." Id. "His behavior," she observed, "began to impact [their] youngest son, who would not go to bed unless he too had checked that all the doors were secure and let his dad know." Id.

Maj. Willerick evaluated Mr. Thomas on February 23, 2016, and again on March 22, 2016. AR 218–22, 260. The evaluations were based on a "clinical interview and history, psychological testing, collateral interviews, review of [Mr. Thomas's] medical records, [personnel information file], and other documentation provided by [his] unit." AR 261; see also AR 218, 222 (listing "procedures" performed).

The report does not include any discussion of Mr. Thomas's experiences in combat in Iraq. It also does not identify the individuals who participated in the "collateral interviews." It does not appear that these interviews included his wife, sisters, or any of his fellow service members who, as discussed above, observed him exhibit symptoms of PTSD.

According to his March 23, 2016 report to Col. Magnus, Maj. Willerick screened Mr. Thomas for PTSD but concluded that Mr. Thomas did not meet the diagnostic criteria. AR 262. That report, however, does not identify the assessment tool that Maj. Willerick used to screen Mr. Thomas for PTSD, nor does it provide the score he received. See AR 260–63.

By contrast, the record of the CDE specifically identifies the psychological assessments that Mr. Thomas underwent to screen for depression (the PHQ-9), alcoholism (the AUDIT-C), and personality disorders (the MCMI-III). AR 220; see Jonathon Woodson, Military Treatment Facility Mental Health Outcomes Guidance, at 4–5 (Sept. 9, 2023) (describing the assessments used in CDEs to assist in diagnostics). The record also includes Mr. Thomas's scores on the PHQ-9 and AUDIT-C. AR 220.

Maj. Willerick advised Col. Magnus that Mr. Thomas's diagnosis, based on the then-current DSM, was "Unspecified Personality Disorder [with] Narcissistic Traits." AR 262. It "appear[s] evident," Maj. Willerick observed, "that when placed under increased stress and faced with disappointment," Mr. Thomas's "narcissistic personality traits are exacerbated as was the case when his retention package was initially declined." AR 261. He further explained that Mr. Thomas's "behavioral issues d[id] not appear to be fully accounted for by a mental health issue[,] and he appear[ed] fully able to discern right from wrong." Id.

Maj. Willerick noted that Mr. Thomas had "expressed significant concerns regarding his return to arming status and performing all duties required of a security forces member." Id. He opined, however, that "this is not based on the presence of a mental health condition and should be addressed with [Mr. Thomas] and his command for consideration regarding return to arming status and subsequently a return to full duty." Id.

Maj. Willerick concluded that Mr. Thomas was not at imminent risk for self-harm or harming others, and that he was fit for service from a mental health perspective. Id. He further found that Mr. Thomas did not suffer from impaired judgment and that there existed no concerns about Mr. Thomas's reliability that were severe enough to warrant removal of a security clearance or limitations on his access to sensitive information. Id. He acknowledged, however, that Mr. Thomas's mental health condition impacted his functional ability "[s]omewhat" in the sense that it had an impact on his interpersonal relationships, including how he came across to those in leadership positions. Id. Maj. Willerick suggested that Mr. Thomas "would benefit from increased insight into how he may come across to others." Id.

### E.    The "Cancellation" of Mr. Thomas's Appeal

On April 5, 2016, about two weeks after the CDE was completed, Mr. Thomas met with Col. Magnus at her request. She informed him that—based on the results of the CDE—she was able to return him immediately to armed status and his primary duty. AR 34. At the same time, according to Mr. Thomas, Col. Magnus questioned whether he wanted to return to regular duty and inquired whether he might be better off leaving the military. AR 24 (Mr. Thomas's written statement to the Board); see also AR 34 (email from Col. Magnus to Mr. Thomas) ("You told me that you did not wish to be returned to armed status or go back to your flight."). In response, according to Mr. Thomas, he advised Col. Magnus that he wanted to reach 20 years of military service before retiring, in large part because he already completed almost 18 years of service, the benchmark for reaching "sanctuary" status. AR 24.

Several weeks later, Mr. Thomas was instructed to send Col. Magnus an email that set forth his understanding of what had been discussed at the April 5 meeting. Mr. Thomas responded by email on April 26, 2016. AR 34. In the email, Mr. Thomas clarified that he was working "in Pass & ID per the orders" given to him the preceding December and that he had not asked to be removed from work at the April 5 meeting. Id. He also informed Col. Magnus that if she "determine[d] that [he] should return to regular duty," he would "follow orders and perform [his] duty in the military manner." Id.

Col. Magnus responded to Mr. Thomas's email the next day. AR 33–34. She recalled that the purpose of the April 5 meeting "was to discuss the results of the [mental health evaluation]." AR 34. She stated that during the meeting she had advised him that "per the [mental health evaluation] [she] had the option" of immediately returning him to armed status and his unit. Id. Col. Magnus further recalled that Mr. Thomas responded that he did not want to be returned to armed status and that he "felt unsafe in the unit." Id. She noted that Maj. Bruce Lawler (with whom Mr. Thomas had been in communication regarding his retention request) confirmed to her that Mr. Thomas told him the same thing. Id. Col. Magnus stated that during the meeting she told Mr. Thomas that she could not transfer him to another unit, but that he could apply for AGR

positions in other units. Id. She concluded her email by asking what had changed "in light of what [he] had told [her] in [the April 5] meeting" and what he just said in his email. Id.

Mr. Thomas responded the next day, April 28. AR 33. He recalled that at the meeting Col. Magnus gave him the "opportunity to speak openly," and that during the meeting he shared his concerns "in light of recent events." Id. He further stated it was his intention to "fulfill [his] commitment to the military." Id. He also observed that, although the mental health evaluation had referred to "verbal and written counseling [he] received for erratic behavior," there was no paperwork reflecting that counselling, nor did he "receive any verbal or written counselling prior to being removed from duty." Id.; see also AR 260. He then opined that "[a]nyone in [his] position would have concerns about returning to [their] primary duty." AR 33. He also stated that, in retrospect, perhaps he should not have spoken so "openly" with Col. Magnus about his concerns. Id. He concluded by confirming he "did not then and do[es] not at this time wish to withdraw [his] appeal and resign." Id.

Col. Magnus responded by email later that day. She reassured Mr. Thomas that it was "absolutely okay that [he] spoke openly," and that she just wanted to be sure that she understood his thoughts and concerns, as well as his intent. Id. Now that he had clarified it, Col. Magnus observed, she would "notify the appropriate staff," and would let him know once she was "advised of a final decision." Id.

On May 6, 2016, roughly one week after the email exchange, and only 25 days from his upcoming separation date, Mr. Thomas followed up with Col. Magnus. He asked whether she knew when a decision would be made on his appeal, which at this point had been pending approximately ten months. AR 32.[5] She responded that on the previous day (May 5) she had "queried ARPC . . . requesting that they provide us final disposition" and that she anticipated that he "should hear a final result in the next day or so." Id.

About four hours later, at 4:00 PM on May 6, Mr. Thomas received an email from Maj. Jason Somers, acting in his capacity as Chief of the AGR Review Board. AR 35, 173. Maj. Somers stated that Mr. Thomas's appeal "was cancelled months ago, at the beginning of [his] health screening and [he] informed [his] unit that [he] no longer wanted to work in [his] current position." Id.[6] Maj. Somers asserted that Col. Magnus had told Mr. Thomas "at that time" that if he did not wish to remain in his unit, his appeal would be "discontinued." Id. Maj. Somers encouraged Mr. Thomas to apply for AGR positions in other units. Id.

---

[5] Mr. Thomas had previously asked Maj. Lawler about the status of his appeal on March 6, 2016. AR 369. On April 4, 2016, Maj. Lawler emailed Mr. Thomas—whether in response to the March 6 email or another inquiry is unclear—that Maj. Lawler had spoken with Col. Magnus about his appeal "and she mentioned that it was currently at [the Air Force Personnel Center]." AR 370.

[6] Maj. Somers did not provide the date on which the appeal was "cancelled." At least as of January 21, 2016, Mr. Thomas's appeal apparently remained pending. On that date, Maj. Somers wrote to Col. Mary Lutz, "If the [CDE] determines he no longer can carry a gun, the appeal will be cancelled." AR 331.

Sometime thereafter, Mr. Thomas apparently made inquiry about whether he could reopen his appeal or lodge a new one. See AR 223. He was informed, however, that "based on the conversation [he] had with Col. Magnus, the AGR Review Board's decision has become final and the [Task Management Tool] tasker has been closed and a further appeal is not an option." Id.

Mr. Thomas followed Maj. Somers's advice to apply for other AGR positions, but he was not selected for any of them. See AR 104–17. On May 31, 2016, the Air Force released Mr. Thomas from active duty and transferred him to the Air Force Reserve. AR 237. At the time of his separation, Mr. Thomas had served on active duty for 17 years, 10 months, and 15 days—just 45 days short of qualifying for sanctuary. See id. Effective December 4, 2016, Mr. Thomas was honorably discharged from the Air Force Reserve. AR 265.

F.    **PTSD Diagnosis**

On May 3, 2017, roughly five months after his discharge from the Air Force Reserve became effective, Mr. Thomas's primary care physician diagnosed him with PTSD. AR 40, 239, 294. Mr. Thomas then consulted with a professional mental health provider at the urging of his wife. AR 271. That provider "confirmed" the primary care physician's initial diagnosis, id., and in June 2017, Mr. Thomas began receiving treatment for PTSD, AR 298; see also AR 271.

A few months later, on or around October 27, 2017, Mr. Thomas was examined by Dr. Richard Waters in connection with his application for VA benefits. AR 266–80. Dr. Waters found that Mr. Thomas met the diagnostic criteria for PTSD. AR 278. After detailing Mr. Thomas's pre-military, military, and post-military history, Dr. Waters provided a non-exhaustive list of five "stressors," i.e., "stressful event[s] [that] can be due to combat, personal trauma, [or] other life threatening situations," that Mr. Thomas had experienced. AR 271–73. Each stressor Dr. Waters identified related to Mr. Thomas's service in Iraq while in the Army. AR 272–73. Dr. Waters also recorded the symptoms that Mr. Thomas had experienced, continued to experience, and were associated with the traumatic events. See AR 277 (observing that Mr. Thomas was claiming functional impairment based on, among other symptoms, hypervigilance, hyperarousal, avoidance behaviors, nightmares, intrusive thoughts, flashbacks, irritability, anger outbursts, panic attacks, bouts of sadness, low self-esteem, and chronic sleep problems).

The Department of Veterans Affairs initially provided Mr. Thomas a disability rating of 90%, including 50% for his PTSD. AR 163. It later adjusted Mr. Thomas's disability rating to 100%, with 70% of the rating based on his PTSD. AR 302. It further found that his PTSD was service-connected, and that Mr. Thomas became "totally and permanently disabled due to [his] service-connected disabilities" on August 5, 2019. AR 300.

II.    **The Initial AFBCMR Decision**

After he received his PTSD diagnosis in connection with his application for VA benefits, Mr. Thomas filed a petition with the AFBCMR seeking a correction of his records to reflect a medical retirement based on disability effective May 31, 2016. AR 22–27. He requested backpay, reimbursement for accrued leave, and medical insurance premiums and costs incurred since May 31, 2016. AR 16.

Mr. Thomas's petition was reviewed by the AFBCMR psychological advisor, Dr. Trina Do. She concluded there was insufficient evidence to support Mr. Thomas's request for a medical retirement due to PTSD and so recommended that the AFBCMR deny his petition. AR 126–28 (summarized by the Board at AR 18). She noted that in his personal statement, Mr. Thomas had explained that "he was unaware that he was experiencing PTSD symptoms while in the service and never sought treatment although he was placed on a 'Do Not Arm' restriction." AR 127. Dr. Do stated, however, that "there [were] no objective reports to substantiate [Mr. Thomas's] claim that he was placed on a restriction," and that "[t]here [was] no official duty limiting conditions profile annotated in his records." Id. She noted that Mr. Thomas's "personnel records were scarce for a service member with 18 years of service," so it was possible that the "restriction could have been placed by his unit and not reported to his medical providers." Id.

Dr. Do also stated that Mr. Thomas did not receive mental health services until more than two years after he was discharged. Id. She found it was therefore "difficult to determine whether his mental health symptoms were exacerbated or aggravated by his military service" as opposed to "post service stressors." Id. She noted it could not be determined whether his mental health symptoms were related to his military service, since a veteran is entitled to medical discharge only if they were unfit at the "'snapshot' time of separation." AR 127–28. Nonetheless, she stated, "the fact is [Mr. Thomas] was never placed on a duty limiting conditions profile, was never deem[ed] not worldwide qualified, never received a Line of Duty determination, and never found unfit for continued military service." AR 127.

Dr. Do recited that she had given "liberal consideration to the applicant's request" in light of his "contended mental health condition." AR 128.[7] Nonetheless, she concluded that "[t]here is no evidence that the applicant suffered from PTSD or other mental health conditions at the time of military service." Id. She acknowledged that "there were symptoms reported in January 2010," but stated that there was "no subsequent recurrence of the symptoms reported in follow-up assessments and during the CDE." Id. Dr. Do further stated that "[Mr. Thomas] was never assessed for PTSD and was never given a diagnosis of PTSD while in service." Id.

Finally, Dr. Do rejected Maj. Willerick's opinion that Mr. Thomas suffered from a personality disorder, which she said had "no clear explanation" and which she opined was "highly unlikely . . . especially since he was 49 years old at the time and was [in] the military for almost 20 years." AR 127. "If he had a valid personality disorder," Dr. Do observed, "it would have been detected early in his military career and by the VA (no reports of personality disorder by the VA), would have noticeably interfered with his functioning, and [he] would have been unsuitable for continued service." Id.

---

[7] Dr. Do's mention of her application of "liberal consideration" to Mr. Thomas's claims invokes a principle contained in a series of DoD issuances, portions of which were codified in 10 U.S.C. § 1552(h)(2). As discussed in greater detail below, those issuances and the statute require military boards to give "liberal consideration" to claims before them that seek relief "based in whole or in part on matters relating to mental health conditions, including PTSD." See AR 137.

### III.    This Action

On August 26, 2020, the AFBCMR denied Mr. Thomas's request for medical retirement and relief. AR 16–20. Without further explanation, it concurred with "the rationale and recommendation of [the] BCMR Psychological Advisor" who concluded that there was insufficient evidence to support Mr. Thomas's request for a medical retirement due to PTSD. AR 19; see also AR 126–28.

On May 31, 2022, Mr. Thomas filed the present action. Compl. In his complaint, he alleged that the Air Force wrongfully discharged him from duty, "failed to properly assess him for retention, improperly cancelled his appeal and out-processed him, and failed to properly medically evaluate him." Id. ¶¶ 1–2.

On August 31, 2022, the Court granted the parties' joint motion to remand the case to the AFBCMR for consideration of several matters that were not addressed in its original decision. Remand Order. The Court instructed the AFBCMR to "evaluate all claims asserted by Mr. Thomas, including his contention that his appeal was improperly cancelled and his contention that he should have received a final medical examination before his release from active duty." Id. at 2.[8]

### IV.    Remand Proceedings

#### A.    The Recommendation of the Second Psychological Advisor

On remand, Mr. Thomas submitted new evidence, including emails from 2016 and 2017 regarding, among other things, his appeal to the AGR Review Board. He also submitted additional medical documentation, a copy of the CDE Report, and a response to Dr. Do's advisory opinion. AR 3. In addition, Mr. Thomas submitted statements from family members and fellow service members as discussed above. See AR 324.

Also before the Board on remand was the opinion of a second psychological advisor, whose name is, for unknown reasons, redacted from their report. AR 323–28 (summarized by Board at AR 6–10). That advisor concluded that the additional information Mr. Thomas provided was "still insufficient" to support his request for a disability retirement. AR 325. The advisor acknowledged that the new information "seemingly demonstrated that [Mr. Thomas] had developed PTSD from his military experiences." Id. The advisor further found that the statements Mr. Thomas supplied were "helpful in gaining more insight into his difficulties," but stated that there were "some issues" with the statements and/or that they were inconsistent with his military records. AR 326. In particular, the advisor pointed out that although Mr. Thomas alleged that he was placed on "Do Not Arm" restrictions from November 2015 until his discharge, he and his unit "could not produce paperwork to substantiate this restriction." Id.

---

[8] Mr. Thomas also previously contended that he did not receive "an opportunity to attend [a Transition Assistance Program]." Remand Order at 2. The Board denied relief on this claim, AR 14, and Mr. Thomas does not challenge this finding, see Am. Compl., ECF No. 27.

The advisor noted that the statements of Mr. Thomas's former AGR colleagues indicated that Mr. Thomas had "behavioral problems, mental health issues, and safety concerns" which "caus[ed] him to not be armed and impaired his ability to perform his duties." Id. The advisor also noted that the statements were corroborated by the "behavioral changes" that caused Col. Magnus to refer him for a CDE. Id. However, the advisor stated, "the results of the CDE performed by a duly qualified mental health provider yielded no mental disorder diagnosis and no duty limitations or restrictions were required or necessary." Id. The advisor found that "the witness statements were not sufficient to supersede the results of his CDE." Id.

The advisor noted that Mr. Thomas alleged he was not evaluated for PTSD during the CDE, but found it unlikely that this allegation was accurate because the standard operating procedure for a CDE would involve a full assessment of mental health conditions and symptoms, including PTSD. AR 327. The advisor also opined that the fact Mr. Thomas was not diagnosed with PTSD "would indicate that he did not meet the diagnostic criteria for this condition because he did not endorse," i.e., report, "the required symptoms for a confirmed diagnosis." Id.

The advisor nonetheless stated that he would give Mr. Thomas "the benefit of the doubt that his condition of PTSD may have existed during service since there was evidence he reported having some PTSD symptoms during his [2010] PDHA." Id. "However," the advisor noted, "the existence of a mental health condition, diagnosis or symptoms does not automatically render a condition as unfitting meeting criteria to be referred to the MEB/DES." Id. The advisor observed:

> As stated in the original advisory, [Mr. Thomas] was never placed on duty limiting condition profile for his mental health condition, he was never deemed not worldwide qualified due to his mental health condition, and [there were] no reports from his commander or providers [that] his mental health condition had interfered with his ability to reasonably perform his military duties in accordance with his office, grade, rank, or rating.

Id.

## B.    The Board's Decision

The Board issued its decision on remand on November 5, 2023. AR 2–20. The Board recited that it applied liberal consideration to the evidence Mr. Thomas submitted but concluded that it was "not sufficient to grant the applicant's request." AR 13. It cited Dr. Do's opinion that there was "insufficient substantiated evidence" Mr. Thomas had PTSD at the time of his military service. Id. It found there was "no evidence" to support that Mr. Thomas "had any potentially unfitting mental health conditions to include PTSD that would meet the criteria for a medical separation." AR 12.

The Board stated that it considered the new evidence Mr. Thomas offered, including eyewitness statements and more thorough post-service health records, but it gave greater weight to the CDE, which "indicated no PTSD diagnosis, no imminent safety concerns, and no duty limitations or restrictions." AR 13. The CDE, the Board noted, occurred during Mr. Thomas's alleged placement on the "Do Not Arm list" but "did not indicate a need for duty limitations or restrictions." Id. The Board also found no evidence existed in the record that corroborated Mr.

Thomas's claim that his commander or medical providers placed him on weapons restrictions. See id.

The Board further found that the preponderance of evidence did not establish any error or injustice with respect to Mr. Thomas's cancelled appeal. Id. It cited the "presumption of regularity that attaches to agency action," which, it said, "includes appeal cancellations for AGR positions." Id. The Board concluded that Mr. Thomas had not provided sufficient objective evidence to overcome the presumption. Id. To the contrary, according to the Board, "the available evidence demonstrates it was [Mr. Thomas's] own actions that caused the cancellation of his AGR appeal and not unilateral command action taken without consent." Id. "In particular," the Board stated, Mr. Thomas's appeal "became moot due to a retraining request," as allegedly "confirmed" by the email to Mr. Thomas from Maj. Somers, as described above. Id.; see also AR 173 (May 6, 2016 email).

The Board noted that there was no evidence that Mr. Thomas ever "reinitiated his appeal following his request for retraining" or "rescinded his retraining request." AR 13. The Board reasoned that "[t]he request for retraining, promoted by his desire to switch to another career field and concerns about his safety in his unit, makes it more likely than not, the appeal was no longer necessary, and cancellation was not improper." Id. It found the cancellation of the appeal "consistent with the regulations in place as retraining necessitates applying for a new AGR position which would render the appeal of his current position moot." Id. The Board additionally stated its conclusion was "supported by the evidence demonstrating he was advised to apply for AGR positions for which he was qualified following his request for retraining per the email dated [May 6, 2016], from [Maj. Somers]." Id.

The Board also concluded that the evidence did not support Mr. Thomas's claim that it was improper that he was not given "a separation physical." AR 14. It explained that Mr. Thomas had undergone a "preventative health assessment" within the timeframe for a physical examination prior to his scheduled date of separation, in accordance with AFI 48-123. Id.[9]

## V.    Amended Complaint and Motion for Judgment on the Administrative Record

Mr. Thomas filed his amended complaint and motion for judgment on the administrative record on March 18, 2024. Am. Compl., ECF No. 27; Pl.'s MJAR. In the amended complaint, he seeks back pay, consideration for disability retirement, and correction of his military records to show that he "continued to serve without interruption on active duty" instead of being separated on May 31, 2016. Am. Compl. at 14–15.

Mr. Thomas contends that the AFBCMR ignored evidence and that its denial of relief was arbitrary and capricious. Id. ¶¶ 115–27. He claims that the Air Force violated AFI 36-2132 Vol. 2 by improperly cancelling his appeal and by failing "to properly assess" his 2015 continuation request under the whole person standard. Id. ¶¶ 104–06. Mr. Thomas also argues

---

[9] Mr. Thomas had also requested that he be granted 60 additional days of leave. AR 166. The Board awarded him 1.5 days of leave. AR 13–14. Mr. Thomas does not raise this issue here. See Am. Compl.

that the Air Force violated DoDI 1332.18 by failing "to properly medically evaluate [him] before his separation." Id. ¶ 114.

On April 17, 2024, the government filed its cross-MJAR. Def.'s MJAR. According to the government, the Air Force's decision to deny Mr. Thomas's 2015 continuation request is nonjusticiable, and the remainder of Mr. Thomas's claims lack merit. Id. at 9–15. Mr. Thomas submitted his response on May 17, 2024, ECF No. 32, and the government submitted its reply on June 17, 2024, ECF No. 33. The Court held oral argument on the cross-motions on October 16, 2024. ECF No. 36.

## DISCUSSION

## I.    Standard of Review

The Court of Federal Claims reviews decisions of military correction boards based on the evidence contained in the administrative record. See, e.g., Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009). In ruling on a motion for judgment on the administrative record pursuant under RCFC 52.1, the court may make "factual findings from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). As distinguished from summary judgment proceedings, genuine issues of material fact do not foreclose judgment on the administrative record. See id. at 1356.

The scope of review of the decision of a military correction board is a narrow and deferential one. The Court is "limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) (stating that a decision of the Board for the Correction of Naval Records is "subject to judicial review" and may be set aside if it is "arbitrary, capricious or not based on substantial evidence").

"An agency's decision is arbitrary and capricious when the agency decision-maker 'entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Kelly v. United States, 69 F.4th 887, 894–95 (Fed. Cir. 2023) (alterations in original) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Strand v. United States, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (internal quotation omitted). The Court may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at 1156.

## II.    The Board's Determination that Mr. Thomas Failed to Show that He Was Unfit to Perform the Duties of His Office, Grade, Rank, or Rating Because of PTSD

### A.    Correction Boards Are Required to Give Liberal Consideration to Disability Claims that Are Based on Service-Connected PTSD

In cases seeking the correction of records that relate to mental health conditions such as PTSD, the military is required by several DoD memoranda and by law to apply certain standards and principles. See, e.g., 10 U.S.C. § 1552(h)(2). It is therefore disappointing that the Board refers to the guidance only indirectly and in passing. AR 13 (asserting that "the Board applied liberal consideration to the evidence submitted by the applicant" but that it was "not sufficient to grant the applicant's request"). Simply asserting that "liberal consideration" was applied, without explaining how, or referring to the specific standards and principles set forth in the memoranda, is neither sufficient nor helpful.

The first memorandum, issued by Secretary of Defense Chuck Hagel in 2014, contains guidance that boards are to use when reviewing requests to upgrade a service member's discharge characterization based on PTSD. Chuck Hagel, Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder (Sept. 3, 2014) ("Hagel Memo"). It recognizes that for Vietnam War veterans "PTSD was not recognized as a diagnosis at the time of service," that PTSD diagnoses often "were not made until decades after service was completed," and that veterans' records frequently did not include sufficient "substantive information" concerning PTSD to make a diagnosis. Hagel Memo, at 1. The Hagel Memo instructs that—in light of these challenges—correction boards must give "liberal consideration" to "petitions for changes in characterization of service" when the former service member's records "document one or more symptoms" of PTSD. Id. attach. at 1.

The second memorandum was issued in 2017 by acting Under Secretary of Defense Anthony Kurta. A.M. Kurta, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment (Aug. 25, 2017) ("Kurta Memo") (reproduced at AR 136–40). It contained additional guidance to military boards considering former service members' requests "for modification of their discharges due in whole or in part to mental health conditions, including PTSD." AR 139. The Kurta Memo extended the liberal consideration requirement to "any petition seeking discharge relief including requests to change the narrative reason, re-enlistment codes, and upgrades from General to Honorable characterizations." Id.

Like the Hagel Memo, the Kurta Memo recognized it would be "unreasonable to expect the same level of proof for injustices committed years ago when . . . mental health conditions, such as PTSD . . . were far less understood than they are today." Id. It provides that "[r]eviews involving diagnosed, undiagnosed, or misdiagnosed . . . mental health conditions, such as PTSD . . . should not condition relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case." AR 140.

On December 12, 2017, Congress codified the Kurta Memo's liberal consideration standard by amending 10 U.S.C. § 1552 to add sub-section (h). See National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 § 520, 131 Stat. 1283, 1379 (2017). Section 1552(h) is applicable to claims before corrections boards involving discharges that are "based in whole or in part on matters relating to post-traumatic stress disorder . . . as supporting rationale . . . and whose post-traumatic stress disorder . . . is related to combat or military sexual trauma, as determined by the Secretary concerned." 10 U.S.C. § 1552(h)(1). Corrections boards must "review [such] claim[s] with liberal consideration to the claimant that post-traumatic stress disorder . . . potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal." Id. § 1552(h)(2)(B).

In Doyon v. United States, 58 F.4th 1235 (Fed. Cir. 2023), the court of appeals addressed the scope of 10 U.S.C. § 1552(h) and the Kurta Memo. In that case, the plaintiff's record reflected that his discharge was based on a personality disorder that rendered him unsuitable for service. Doyon, 58 F.4th at 1237. The plaintiff asked the Board for the Correction of Naval Records to correct his records to instead reflect a medical discharge due to service-related PTSD. The Federal Circuit held the liberal consideration standard applied to the plaintiff's request because he was seeking to correct the narrative reason for his discharge. Id. at 1247–48.

In this case, Mr. Thomas, like the service member in Doyon, is asking that a reviewing board change the narrative reason for his discharge from "completion of AGR Military Duty Tour" to a medical retirement. It therefore falls squarely within the reasoning of Doyon, as well as the language of 10 U.S.C. § 1552(h)(1).[10]

### B.    The Board's Determinations Regarding Whether Mr. Thomas Suffered from Service-Related PTSD and Whether He Was Unfit for Duty as a Result of PTSD

By statute, a service member is entitled to disability retirement where they are "'unfit to perform the duties of [their] grade, rank, or rating' because of a service-related disability and have at least 20 years of service or a disability rating greater than 30%." Kelly v. United States, 69 F.4th 887, 889 (Fed. Cir. 2023) (emphasis omitted) (quoting 10 U.S.C. § 1201); see also DoDI 1332.18 ¶ 6.2(a) (providing that a member may also be found unfit where their disability "[r]epresents a decided medical risk to their health or to the welfare or safety of other members" or "[i]mposes unreasonable requirements on the military to maintain or protect the Service

---

[10] The Court notes that in several recent cases (but not this one) the government has argued that liberal consideration does not apply to determinations whether a service member's PTSD has rendered them unfit for duty and eligible for a medical retirement. See Bee v. United States, 2024 WL 3912596, at *9 (Fed. Cl. Aug. 23, 2024); Doyon v. United States, 2024 WL 3861736, at *9 (Fed. Cl. Aug. 19, 2024); see also Ashish S. Vazirani, Clarifying Guidance to Boards for Correction of Military/Naval Records Considering Cases Involving Both Liberal Consideration Discharge Relief Requests and Fitness Determinations (April 4, 2024). The Court is of the view that the plain language of 10 U.S.C. 1552(h) as well as the Doyon decision dictate that principles of liberal consideration do apply to fitness claims. In this case, the Board must have reached the same conclusion, given that both it and its psychological advisors made reference to "liberal consideration" (albeit only in passing). AR 13.

member"). In this case, the AFBCMR concluded that Mr. Thomas did not prove that he was unfit for duty based on service-connected PTSD and therefore found him not entitled to a correction of his records to reflect a disability retirement. AR 12–13. For the reasons set forth below, the Board's decision was arbitrary and capricious, unsupported by substantial evidence, and inconsistent with law.

### 1.    Whether Mr. Thomas Suffered from Service-Related PTSD

As described above, Dr. Do, the first psychological advisor who reviewed Mr. Thomas's records, stated that she applied "liberal consideration" to Mr. Thomas's application because he contended that he suffered from a "mental health condition." AR 128. She nonetheless concluded that Mr. Thomas's claim lacked merit because there was "no substantiated evidence" that he suffered from PTSD or other mental health conditions at the time of his military service. Id. The Board incorporated the substance of Dr. Do's advisory opinion almost verbatim into its first opinion. See AR 18 ("Air Force Evaluation"). It then expressed its concurrence with her rationale and recommendation in a few conclusory sentences, without additional analysis. See AR 19.

After the Court remanded the case to the Board, a second unnamed psychological advisor prepared a "supplemental advisory." AR 323–28. Unlike Dr. Do, the second advisor stated that principles of liberal consideration required that Mr. Thomas be given "the benefit of the doubt that his condition of PTSD may have existed during service since there was evidence he reported having some PTSD symptoms during his [2010] PDHA." AR 327. The second advisor also "d[id] not dispute" that the PTSD "was related or connected to his military service." AR 325.

Although it is not entirely clear, it appears that the Board (on remand) again endorsed Dr. Do's finding that the record did not contain sufficient evidence to establish that Mr. Thomas suffered from service-related PTSD. The decision included a verbatim recitation of the second psychological advisor's opinion. See AR 6–10. But in the section devoted to its findings and conclusion, the Board expressly cited and relied upon Dr. Do's assertion that "there was insufficient substantiated evidence that a condition existed at the time of the applicant's military service." AR 13. It also discounted the "eyewitness statements and post service health records" that Mr. Thomas supplied because "the results of [Mr. Thomas's] CDE indicated no PTSD diagnosis." Id.

The Board's decision on remand, which gave controlling weight to Maj. Willerick's opinion that Mr. Thomas did not suffer from PTSD, reflects a failure to apply the principles of liberal consideration set forth in the Kurta Memo. The Kurta Memo states that "absent clear evidence to the contrary, a diagnosis rendered by a licensed psychiatrist or psychologist is evidence that a veteran had a condition that may excuse or mitigate the discharge." AR 138. It also instructs that "[a] determination made by the Department of Veterans Affairs (VA) that a veteran's mental health condition, including PTSD . . . is connected to military service . . . is persuasive evidence that the condition existed or experience occurred during military service." Id.

Here, on October 27, 2017, a licensed psychologist, Dr. Waters, evaluated Mr. Thomas and wrote a detailed report of his findings, including a description of a number of highly stressful

events related to Mr. Thomas's service in combat in Iraq, as well as a catalogue of the symptoms of PTSD that Mr. Thomas reported. AR 266–80. He concluded that Mr. Thomas met the diagnostic criteria for PTSD diagnosis under the DSM. AR 266. And, as a result of Dr. Waters' opinion, the VA found that Mr. Thomas suffered from PTSD connected to his military service.

The Board, however, did not treat Dr. Waters's diagnosis as persuasive evidence that Mr. Thomas suffered from PTSD during his military service, as the Kurta Memo requires. In fact, the Board did not discuss Dr. Waters's evaluation at all. Its only mention of the VA's determination comes in the context of its reference to the distinction between establishing a disability for purposes of VA benefits and doing so for purposes of Title 10. See AR 12.

Further, the Board did not determine whether there was "clear evidence" in the record to rebut the conclusions Dr. Waters and the VA reached, as the Kurta Memo also requires. The only evidence that the Board relied upon to support its finding that Mr. Thomas did not meet the diagnostic criteria for PTSD was the report of Maj. Willerick, who conducted the CDE. He was of the opinion that Mr. Thomas's difficulties were a product of a personality disorder, not PTSD. But the Board's own advisor, Dr. Do, expressly rejected Maj. Willerick's diagnosis, finding it "highly unlikely that [Mr. Thomas] had a personality disorder" because, among other reasons, "[i]f he had a valid personality disorder, it would have been detected early in his military career and by the VA." AR 127. The Board did not consider whether—notwithstanding his misdiagnosis of Mr. Thomas—that report supplied "clear evidence" to rebut Dr. Waters's opinion.

Moreover, the Board did not consider that the medical record of the CDE contains no mention of PTSD. Nor does it identify the screen that Dr. Willerick used as the basis for his conclusion that Mr. Thomas did not meet the diagnostic criteria. These omissions are noteworthy given that Mr. Thomas denies being screened for PTSD as part of the CDE, see AR 23, and military guidance appears to require the use of the "PCL" (Post Traumatic Checklist) when a mental health provider evaluates for PTSD, AFI 44-172 ¶ 2.5.1.[11] The lack of record of a PCL or any other PTSD screen is especially noteworthy as the CDE record does specify the screens Maj. Willerick used for depression, alcoholism, and personality disorders, including the scores where applicable. See AR 220.

The Board should have, but did not, consider whether the apparent failures to document the screen that was used and subsequent results cast further doubt on Maj. Willerick's conclusion that Mr. Thomas did not meet the diagnostic criteria for PTSD, or if Maj. Willerick conducted any PTSD screen at all. The absence of medical records that document the screen that Maj. Willerick may have used is of particular concern when one compares the extensive records

---

[11] AFI 44-172 refers to "Assistant Secretary of Defense/Health Affairs Memorandum, Military Treatment Facility Mental Health Outcomes Guidance, 9 September 2013." The guidance describes the PCL as "a 17-item self-report measure of the 17 DSM-IV symptoms of PTSD" that can be completed in approximately 5–10 minutes. Jonathon Woodson, Military Treatment Facility Mental Health Clinical Outcomes Guidance, at 5 (Sept. 9, 2023). It further notes that there are three versions of the PCL and that "[t]he version mandated in this guidance is the PCL-M (military) which asks about symptoms in response to 'stressful military experiences.'" Id.

accompanying Dr. Waters's exam, as Dr. Waters recorded Mr. Thomas's traumatic experiences as well as his symptoms in great detail. See AR 266–80.

Further, the Kurta Memo recognizes that evidence supporting a service member's PTSD diagnosis can come from sources other than a veteran's service records, including statements from family members, friends, and fellow service members. AR 137. In addition, evidence of the condition may include "changes in behavior; requests for transfer to another military duty assignment; deterioration in work performance; [and] inability of the individual to conform their behavior to the expectations of a military environment." Id.

Here, Mr. Thomas's fellow service members, his sisters, and his wife supplied statements that Mr. Thomas was experiencing symptoms consistent with PTSD after his deployments to Iraq and when he served in the AGR. AR 283–91. These symptoms included aggressiveness, hypervigilance, depression, and disturbed sleep. See id. Further, his command ordered the CDE because of concerns about his "[bizarre] patterns of behavior" in the months following his receipt of the AGR Review Board's non-retention decision. See AR 260. And his wife similarly observed deteriorations in his mental condition during the fall of 2015. AR 290–91.

The Board stated that it "noted the eyewitness statements and post-service health records provided by the applicant," but it discounted them without further discussion, again because "the results of his CDE indicated no PTSD diagnosis." AR 13. The Board did not explain why it chose to credit Maj. Willerick's assertion that Mr. Thomas did not meet the diagnostic criteria for PTSD over the statements of family members, friends, and others who had the opportunity to observe him on an on-going basis.

Finally, the Board's decision fails to address the fact that, at the time of the CDE, Mr. Thomas was also awaiting the results of his appeal of the AGR Review Board's non-retention decision. As his wife observed, he "was under the impression that the mental health evaluation he was sent for in early 2016," i.e., the CDE, "would determine if he w[ere] fit to return to armed status and that would determine if he would be given another contract extension." AR 290; see also AR 24. Mr. Thomas therefore had every reason during the CDE to downplay the stressors he was experiencing, which he reported in detail to Dr. Waters after he left the service. Specifically, he told Dr. Waters that, after joining the Air Force, and throughout his Air Force career, he felt "on guard" and "watchful," and experienced "intrusive thoughts," nightmares, suspiciousness, paranoia, and "chronic poor sleep." AR 270. Nonetheless, he confessed, "he resisted seeing [a mental health professional], despite his wife's and friends' insistence that he see a therapist, because he feared that he would be diagnosed with PTSD and that this would impair his [Air Force] career with the military police." AR 270–71. Indeed, as the Kurta Memo reflects, Mr. Thomas's concerns in this regard are typical of those harbored by service members with mental health impairments. See AR 140 (noting that mental health conditions often are unreported, and relief should not be conditioned on evidence "that would be unreasonable or unlikely under the specific circumstances of the case").

Based on the foregoing, the Court concludes that the Board committed legal error by not giving "liberal consideration" to Mr. Thomas's claim as required by statute and the DoD memoranda. The Board's finding that Mr. Thomas was not suffering from service-connected PTSD at the time of his service in the Air Guard Reserve was arbitrary and capricious, and not

supported by substantial evidence. On remand, the Board shall reconsider its finding, ensure that its conclusions and analysis are consistent with this opinion, and clearly apply the principles of liberal consideration as set forth above.

### 2.    Whether Mr. Thomas Was Fit to Perform His Duties

In addition to finding that Mr. Thomas failed to prove that he suffered from service-connected PTSD, the Board also found that Mr. Thomas did not prove that he was unfit to perform the duties of his position at the time of his separation. AR 12. The Board asserted it "took note" of the VA's diagnosis and disability ratings, the statements from Mr. Thomas's colleagues, and the post-service health records, but found "no evidence in [Mr. Thomas's] record [that] his unit put him on a 'Do Not Arm' restriction" and "no evidence from his commander or medical providers which indicate his mental health condition interfered with his ability to reasonably perform his military duties." AR 12–13. It also stated that "his CDE indicated no PTSD diagnosis, no imminent safety concerns, and no duty limitations or restrictions." AR 13.

The Board's fitness determination was not based on the record as a whole, and its findings are not supported by substantial evidence. To begin with, the Court is perplexed by the Board's repeated and conclusory assertions that the evidence in the record does not support Mr. Thomas's allegations that his access to weapons had been restricted, or that Mr. Thomas was ever unable to perform his military duties. Whether or not Mr. Thomas's name was ever put on an official "do not arm" list,[12] there can be no dispute that in the wake of his "increasingly [bizarre] patterns of conduct that worsened after his retention package was initially declined," AR 260, Mr. Thomas's superiors decided it was not safe for him to be armed. They therefore had him disarmed and transferred him to a unit where he presumably would not be engaged in law enforcement activities or required to carry a weapon. See AR 24, 310. In fact, the very purpose of the CDE was to determine whether Mr. Thomas could be <u>returned</u> to armed status. AR 260 (CDE Report explaining that Mr. Thomas "was removed from arming status and referred for a CDE"); AR 34, 176 (email from Col. Magnus stating "per the [CDE results], [she] had the option to <u>return</u> [Mr. Thomas] to armed status" (emphasis added)); AR 370 (email from Maj. Lawler stating that Mr. Thomas could "[b]e cleared to <u>return</u> to work in [his] primary duty" by the CDE (emphasis added)); <u>see also</u> AR 285 (fellow service member's letter observing that Mr. Thomas's "usual jovial state[] would be replaced with a quiet almost depressed state" and that this was happening often enough that their commander at the time, Lt. Col. Thiel, "though[t] it would be best for his safety to disarm him").

The Board similarly found it significant that Mr. Thomas was never placed on a "duty limiting condition profile." AR 13. A "duty-limiting condition" is a "medical condition which impairs and/or prevents an [a]irman from performing at least some requirements of military service and/or duties expected to be a part of his/her air force specialty code [] and/or current assignment." AFI 48-133 § 1.3.2. Duty limiting conditions are required to be memorialized on Air Force Form 469—the duty limiting condition "profile." <u>Id.</u> § 1.3. According to the second

---

[12] A "do not arm list" is "[a] list of assigned personnel who were formerly authorized to be armed, but are no longer authorized—normally temporary in nature either while an investigation is ongoing or administrative action is taking place." Air Force Manual 31-129 attach. 1 at 90.

psychological advisor, had Mr. Thomas been placed on a duty limiting condition profile, he would have been referred to mental health treatment, and/or entered the Disability Evaluation System by referral to an MEB. See AR 326.

The fact that Mr. Thomas was not placed on a duty limiting condition profile, as with the fact that he was apparently not put on a "do not arm list," is not dispositive of whether his command viewed him as unfit to carry a weapon and therefore unfit to perform the duties of his office, grade, rank, or rating. The very reason he was not put on a duty limiting condition profile and referred to the DES prior to discharge was Maj. Willerick's finding that Mr. Thomas did not have PTSD and therefore could safely be returned to duty. Highlighting that his command did not take these formal actions begs the question of whether these actions were warranted, notwithstanding Maj. Willerick's opinion. And the Board did not explain why it credited Maj. Willerick's assessment of Mr. Thomas's fitness to carry a weapon in light of the other evidence in the record showing that Mr. Thomas continued to exhibit symptoms of PTSD which troubled his superiors, fellow service members, and family.

It also bears noting that none of the several mental health providers who evaluated Mr. Thomas either during or after his service concluded that his "[bizarre]" behaviors were reflective of a personality disorder, as Maj. Willerick opined. AR 260. Obviously, the weight assigned to Maj. Willerick's determination that Mr. Thomas was fit to return to his duties would be dependent on whether he accurately diagnosed Mr. Thomas's mental health condition. The Board should have, but did not, consider whether Maj. Willerick's misdiagnosis of Mr. Thomas's mental health condition also undermined the credibility of his conclusion that Mr. Thomas could be rearmed and returned to duty without any restrictions.

Further, the Board's statement that there was "no evidence from [Mr. Thomas's] commander . . . which indicate[d] his mental health condition interfered with his ability to reasonably perform his military duties in accordance with his office, grade, rank, or rating" is inconsistent with the record. See AR 13. The Board overlooked evidence showing that—because of his unspecified "[bizarre]" conduct—Mr. Thomas's superiors harbored concerns about retaining him as a member of the security forces squadron not only before the CDE but also after it. In fact, despite Maj. Willerick's conclusion that Mr. Thomas was fit to carry a weapon, Mr. Thomas was never returned to his regular position, even after he expressly confirmed that it was his wish that he be allowed to do so at the end of April 2016. See AR 33–34, 281.

As described above, in June 2015, Lt. Col. Thiel "HIGHLY recommend[ed]" that the AGR Review Board grant Mr. Thomas's appeal of its non-retention decision because he "excel[led] at every facet of his job," and "would be difficult to replace." AR 84. He was also worried that denying Mr. Thomas another term of service when he was so close to reaching sanctuary would have a significant negative impact on the morale of all members of the AGR program. Id. Indeed, Lt. Col. Thiel said that he could not "stress enough the importance of granting [Mr. Thomas] career status." Id.

Originally, all members of leadership in Mr. Thomas's unit agreed with Lt. Col. Thiel's recommendation. AR 331; see also AR 359–66. As described above, however, by November 2015, Mr. Thomas was disarmed because of his "increasingly [bizarre] patterns of behavior," AR 260, and by December 10, he was transferred to a new unit, AR 310. By January 2016, the

command recommendation that it was critical to retain Mr. Thomas was "no longer valid." AR 331. To the contrary, his superiors had by then determined that if the CDE found Mr. Thomas fit, the previously submitted "appeal recommendations should be changed to reflect [their] actual recommendation," i.e., that he not be retained. Id. Further, his superiors seem to have considered how to separate Mr. Thomas quickly should the CDE take longer than expected. AR 334 (email from Maj. Somers) ("[I]f we don't have a finalized [CDE] ruling by mid-March . . . we should re-attack on the [Memorandum for Reference] recommendation . . . and push the ARB Appeal."). Moreover, according to Mr. Thomas, Col. Magnus tried to persuade him to accept a separation from service. See AR 24 (stating that during his meeting with Col. Magnus after the CDE, "she spent a lot of time questioning if [he] really wanted to return to regular duty and if it would not be better for [him] to leave the service").

Ultimately, it was not necessary for Mr. Thomas's superiors to retract their original favorable recommendation regarding Mr. Thomas's retention, even after the CDE found Mr. Thomas fit. Instead, as discussed below, they treated his appeal as "cancelled" so that Mr. Thomas was separated in May 2016. Regardless, his command's dramatic change of heart concerning whether he should be retained in the wake of his "[bizarre] patterns of behavior" certainly could be seen as evidence that his superiors remained of the view that—notwithstanding the CDE—he was unable to reasonably perform his duties. And their views of his capabilities should have been, but were not, considered or given weight by the Board. Cf. DoDI 1332.18 ¶ 6.3.b (stating that "when a Service member is referred for disability evaluation" for a chronic condition, "a supervisor's evaluation or personal testimony of the Service member's duty performance may more accurately reflect the capacity to perform" than a medical evaluation).

In short, while the Board paid lip service to the requirement that Mr. Thomas's claims be given liberal consideration, in practice it failed to actually do so. The Court therefore orders that Mr. Thomas's medical retirement claim be returned to the Board for further consideration, consistent with this opinion.

III.   **Mr. Thomas's Challenges to the Substance of the Decision Not to Retain Him for Another Term and to the Cancellation of His Appeal**

A.   <u>The Challenge to the Substance of the Non-Retention Decision</u>

Air Force Instruction 36-2132 Vol. 2 ¶ 4.3 provides that AGR Review Board decisions regarding retention are "based on the needs of the AFR." It states that, in making its determinations, the AGR Review Board "considers the individual's request and leadership recommendations." AFI 36-2132 Vol. 2 ¶ 4.5. It further advises that "[l]eadership should consider the individual's total background using the 'whole person' concept," which it explains "may include training, work experience, performance reports, awards and decorations, and developmental education." Id. ¶ 4.3.

Mr. Thomas claims that the AGR Review Board violated AFI 36-2132 because it failed to apply "the whole person concept" in the course of evaluating his request for retention. He points to, among other things, his 17 years of honorable service with no incidents of misconduct, his good performance evaluations, his two combat deployments, and the multiple awards and

decorations he received. <u>See</u> Pl.'s MJAR, at 14–16. In addition, Mr. Thomas relies upon the strong recommendations of his commander and deputy commander in favor of his retention, and the fact that the AGR Review Board selected three other airmen with less experience for continued service. <u>Id.</u>

The Court agrees with the government that Mr. Thomas's challenge to the substance of the AGR Review Board's retention decision is not justiciable. Justiciability "depends on 'whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.'" <u>Murphy v. United States</u>, 993 F.2d 871, 872 (Fed. Cir. 1993) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 198 (1962)). If there are no clear "tests and standards which [courts] can soundly administer within their special field of competence," a controversy is not justiciable. <u>Voge v. United States</u>, 844 F.2d 776, 780 (Fed. Cir. 1988); <u>see also</u> <u>Murphy</u>, 993 F.2d at 873 ("[J]udicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.").

Here, there exist no clear standards within the Court's field of competence against which it can review the substance of the Air Force's decision to not retain Mr. Thomas. AFI 36-2132 states that AGR Review Board decisions "are based on the needs of the AGR." Vol. 2 ¶ 4.3. And "[t]he complex, subtle, and professional decisions as to the composition . . . and control of a military force are essentially professional military judgments." <u>Gilligan v. Morgan</u>, 413 U.S. 1, 10 (1973). To be sure, "a challenge to the particular <u>procedure</u> followed in rendering a military decision" is justiciable," <u>Adkins v. United States</u>, 68 F.3d 1317, 1323 (Fed. Cir. 1995), and Mr. Thomas has mounted just such a challenge with respect to his cancelled appeal of the AGR Review Board's decision. But "[t]he [underlying] merits of the Air Force's decision to release [a service member] from active duty are beyond judicial reach." <u>Murphy</u>, 993 F.2d at 874.

Accordingly, the AGR Review Board's decision denying Mr. Thomas's retention request "is like [the] thousands of other routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or jurisdiction of courts to wrestle with." <u>Voge</u>, 844 F.2d at 780 (collecting cases). Count II of Mr. Thomas's complaint, to the extent that it challenges the substance of the AGR Review Board's non-retention determination, is therefore dismissed with prejudice for failure to state a claim. <u>See</u> <u>Antonellis v. United States</u>, 723 F.3d 1328 (Fed. Cir. 2013) (upholding dismissal for failure to state a claim based on a nonjusticiability).

### B.    <u>The Challenge to the Cancellation of Mr. Thomas' Appeal</u>

#### 1.    **Merits**

It is well established that the military departments, like other federal agencies, are bound by their own regulations. <u>See</u> <u>Wagner v. United States</u>, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (citing <u>Service v. Dulles</u>, 354 U.S. 363, 388 (1957)); <u>Carmichael v. United States</u>, 298 F.3d 1367, 1373–74 (Fed. Cir. 2002); <u>Voge</u>, 844 F.2d at 779. As the Federal Circuit has observed, "[e]ven when Congress has given the military discretion in conducting its affairs, the military is bound to follow its own procedural regulations should it choose to promulgate them." <u>Fisher v. United States</u>, 402 F.3d 1167, 1177 (Fed. Cir. 2005). And "[a] court may decide whether the

military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion." Id. (citation omitted); see also Adkins, 68 F.3d at 1323 (observing that the Federal Circuit "has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy"); Dodson v. U.S. Gov't, Dep't of Army, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (observing that, although the Secretary was not required to promulgate regulations establishing criteria for determining to whom the Army would grant re-enlistment, "having done so he is bound to follow them").

The procedural regulation at issue, AFI 36-2132 Vol. 2 ¶ 4.5, gives service members the right to appeal AGR Review Board decisions to the Chief of Air Force Reserve. Mr. Thomas filed such an appeal. But the Chief of Air Force Reserve never acted on it. Instead, as described above, Mr. Thomas's appeal was "cancelled," although by whom, when, and how, remains a mystery.

The AFBCMR rejected Mr. Thomas's challenge to the cancellation of his appeal of the AGR Review Board's non-retention decision. It relied in large part on the "presumption of regularity that attaches to agency action." AR 13. That presumption "provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties." Miley v. Principi, 366 F.3d 1343, 1347 (Fed. Cir. 2004) (citing Butler v. Principi, 244 F.3d 1337, 1339 (Fed. Cir. 2001)). Put another way, the "doctrine . . . allows courts to presume that what appears regular is regular, the burden shifting to the attacker to show the contrary." Butler, 244 F.3d at 1340 (citations omitted).

"The presumption of regularity, like the hearsay exception for business records in the Federal Rules of Evidence, has 'at [its] root a showing that the [result] was the product of a consistent, reliable procedure.'" Mathis v. McDonald, 643 F. App'x 968, 973 (Fed. Cir. 2016) (alterations in original) (quoting Posey v. Shinseki, 23 Vet. App. 406, 410 (2010)). Therefore, it "should be predicated on evidence that gives [the court] confidence that a particular procedure is carried out properly and yields reliable results in the ordinary course." Id.

In Miley, for example, a veteran argued that a regional office of the Department of Veterans Affairs had not mailed him notice of an adverse decision, which would have triggered the deadline for him to file an appeal. See Miley, 366 F.3d at 1344. The court of appeals rejected the veteran's argument that the VA failed to establish that it had provided the required notice. It observed that a presumption of regularity could be employed, "in the absence of evidence to the contrary, [to establish] that certain ministerial steps were taken in accordance with the requirements of law." Id. at 1347 (emphasis added).

Here, unlike the mailing of notice in Miley, the cancellation of Mr. Thomas's appeal was not a ministerial act. Nor was it the product of a reliable procedure. The government, in fact, has acknowledged that the Air Force maintains no rules or standardized practices governing the cancellation of appeals. See Response to Order, ECF No. 35.

Indeed, what transpired here reflects the arbitrary and capricious nature of the cancellation of Mr. Thomas's appeal. It is undisputed that Mr. Thomas never told the AGR

Review Board, the Chief of Air Force Reserve, or anyone in his chain of command, that he wished to withdraw or cancel his appeal. To the contrary, he did the opposite. And although it is up to the Chief of Air Force Reserve to resolve appeals from AGR Review Board retention decisions, it is apparent that the decision to "cancel" the appeal based on mootness was not made by the Chief.

Nonetheless, the Board found that "it was [Mr. Thomas's] own actions that caused the cancellation of his AGR appeal and not unilateral command action taken without consent." AR 13. "In particular," the Board observed, Mr. Thomas's appeal "became moot due to a retraining request." Id. According to the Board, "the request for retraining, promoted by his desire to switch to another career field and concerns about his safety in his unit, makes it more likely than not, the appeal was no longer necessary, and cancellation was not improper." Id.

This reasoning is flawed in numerous respects. First, and contrary to the Board's conclusions, Mr. Thomas's appeal did not become moot when he expressed a reluctance to return to his unit or sought retraining that would enable him to move into a different position. An appeal becomes moot "when it is impossible to grant the appellant any effectual relief whatever." Acceleration Bay LLC v. 2K Sports, Inc., 15 F.4th 1069, 1076 (Fed. Cir. 2021) (citations omitted). Up to the date of his separation, Mr. Thomas had not secured another position; nor had his retraining requests been granted. Had the Chief of Air Force Reserve granted Mr. Thomas's appeal he would have received effective relief: he would have been retained in his then-current position for another term.

Second, the Board's finding that Mr. Thomas's appeal was cancelled because he requested retraining or because he otherwise indicated that he no longer wished to remain in his unit is not supported by substantial evidence. It is based entirely on the May 6 email from Maj. Somers to Mr. Thomas. In that email, Maj. Somers asserted that Mr. Thomas's appeal "was cancelled at the beginning of [his] health screening and [Mr. Thomas] informed [his] unit that [he] no longer wanted to work in [his] current position." AR 173. He further asserted that "Col. Magnus informed [Mr. Thomas] at that time that if [he] did not want to stay in [his] current unit, [his] appeal would be discontinued." Id.

Maj. Somers did not identify who cancelled Mr. Thomas's appeal, how they did so, or under what authority. Nor did the AFBCMR do so in its decision. Instead, employing the passive voice, Maj. Somers vaguely asserted that the appeal "was cancelled." Id. Moreover, Maj. Somers's statement that the appeal was cancelled "months ago, at the beginning of [Mr. Thomas's] health screening" makes no sense. Maj. Somers appears to be saying the reason the appeal was cancelled was that Mr. Thomas told Col. Magnus he did not want to return to his unit during their April 5 meeting, to which she allegedly responded that, if so, his appeal "would be discontinued." Id. But the April 5, 2016, meeting took place after the health screening, i.e., the CDE, which was conducted on February 23 and March 22, 2016. AR 260. Further, Mr. Thomas's email of April 28 shows that—to the extent Col. Magnus understood that Mr. Thomas was disavowing any intent to return to his unit, even if his appeal were granted—she was mistaken. In that email he reiterated his desire to be retained in his position and continue to pursue his appeal, stating that "[he] did not [at the time of their meeting] and [did not at the time of his April 28, 2016 email] wish to withdraw [his] appeal and resign." AR 33.

Col. Magnus did not tell Mr. Thomas that his appeal had nonetheless already been cancelled. Instead, she thanked Mr. Thomas for his email, stated her understanding that he had "clarified" his intent, represented that she would "notify the appropriate staff," and agreed to inform him of a final decision on his appeal when it occurred. Id. Mr. Thomas later inquired about when his appeal would be decided, to which Col. Magnus responded that she "queried [the Air Reserve Personnel Center] on May 5, 2016, and "anticipate[d]" a decision in "the next day or so." AR 32. Thus, as of early May, it appears that Col. Magnus herself did not understand that Mr. Thomas's appeal had been cancelled "months ago."

The timing of these events undermines the Board's finding that the appeal was cancelled as a result of Mr. Thomas's actions. If the cancellation of the appeal was based on Mr. Thomas telling Col. Magnus that he did not want to return to his unit, why did Col. Magnus believe (or represent to Mr. Thomas) that the appeal was pending up until May 5? Who, if not Col. Magnus, informed the Chief of Air Force Reserve that Mr. Thomas wished to cancel his appeal? And if a conversation that took place in April was the basis for the cancellation, why did Maj. Somers fix the time of cancellation at the beginning of his health evaluation (the end of February 2016)?[13]

Finally, the regulations contain no provisions that afford any person or entity other than the appeals authority the power to dispose of an appeal, whether by cancellation or denial. See AFI 36-2132 Vol. 2 ¶ 4.5. Even if the Board were correct that Mr. Thomas's actions mooted his appeal (and it was not), that would be a determination to be made by the Chief of Air Force Reserve, not unnamed others in Mr. Thomas's chain of command. In short, the AFBCMR's ruling upholding the cancellation of Mr. Thomas's appeal was arbitrary and capricious, unsupported by substantial evidence and contrary to Air Force regulations.[14]

---

[13] The record shows that others in Mr. Thomas's chain of command were also under the impression that his appeal remained pending into April. AR 370 (April 4 email from Maj. Bruce Lawler stating that he had spoken to Col. Magnus about the appeal package and "she mentioned that it was currently at ARPC" and noting an option available to Mr. Thomas was that he would be cleared to return to duty and his appeal might still be granted).

[14] As discussed above, it is well established that the military is bound to follow its own procedural regulations even where—as here—the substance of a determination is left entirely to its discretion and not subject to review. In general, to establish entitlement to a remedy where the military violates its own procedural regulations, a plaintiff must show that the procedural error substantially affected the outcome of the matter. Wagner v. United States, 365 F.3d 1358, 1361 (Fed. Cir. 2004); see also Christian v. United States, 337 F.3d 1338 (Fed. Cir. 2003). Harmless error review is not appropriate, however, where "it is not possible for a reviewing body to determine what effect the error had on the judgment of the original proceeding." Doyle v. United States, 599 F.2d 984 (Ct. Cl. 1979); see also Wagner, 365 F.3d at 1362. The government has not argued that Mr. Thomas must prove that the cancellation of his appeal affected the outcome of his retention request. Nor would such an argument be successful because it is impossible for the Court or the Board to determine the likelihood that his appeal would have resulted in a favorable decision regarding his retention had it not been improperly cancelled.

### 2.    Remedy

Although the Court has concluded that judgment on the administrative record should be entered on Mr. Thomas's claim that his appeal was improperly cancelled, his remedy for that procedural violation is a limited one. The Court cannot decide whether the AGR would have retained Mr. Thomas for an additional term had the appeal not been improperly cancelled because that determination is reserved to the military. See Dodson, 988 F.2d at 1208 (declining to decide whether the Army would have exercised its discretion to reenlist the plaintiff were it not for the procedural error it committed because "that decision is properly for the Army, not the court"). The best the Court may do is to "remedy the legally defective process so as to put [the plaintiff] into the position that he would have been [in] had the proper procedures been followed at the relevant times." Id.

In this case, that means that on remand the Board should correct Mr. Thomas's records to reflect that his appeal of the non-retention decision was not cancelled and is still pending. Once that correction is made, his appeal should be retroactively decided, either by the Chief of Air Force Reserve, as contemplated under the regulations in effect at the time that Mr. Thomas filed his appeal, or through another reasonable process devised by the Secretary of the Air Force. Should the decision on appeal be to honor the original recommendation of his command, the Air Force should take such action as is necessary to put Mr. Thomas in the position he would have been in, had he been given an extension of his contract and achieved sanctuary status, including, as appropriate, backpay and other benefits.

## CONCLUSION

For the reasons stated above, Mr. Thomas's MJAR, ECF No. 28, is **GRANTED**. The government's cross-MJAR, ECF No. 31 is **DENIED**.

With respect to relief, the Tucker Act states that "[t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing . . . placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2). It also has the authority "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." Id.

Consistent with this authority, the Court **REMANDS** the case to the AFBCMR to:

1)    Reconsider whether Mr. Thomas had service-related PTSD at the time he was separated from the AGR, consistent with this opinion and the principles of "liberal consideration" described above and in the Kurta Memo; and

2)    Reconsider whether Mr. Thomas was fit to perform the duties of his office, grade, rank, or rating because of service-connected PTSD at the time he was separated from the AGR, as consistent with this opinion and the principles of liberal consideration as described above.

The AFBCMR shall also ensure that all medical records discussed by its psychological advisors, including the 2010 PDHA and the 2012 and 2013 self-assessments, are included in the administrative record and considered on remand.

Should the Board conclude that Mr. Thomas was <u>not</u> fit to perform the duties of his office, grade, rank, or rating because of service-connected PTSD at the time he was separated from the AGR, it shall correct his records to reflect a disability retirement, effective May 31, 2016.

Should the Board conclude that Mr. Thomas <u>was</u> fit to perform the duties of his office, grade, rank, or rating at the time he was separated from the AGR, it shall:

1) Correct Mr. Thomas's records to reflect that his appeal of the non-retention decision was not cancelled and is still pending; and

2) Devise and implement a process for resolving Mr. Thomas's appeal.

The remand proceedings must be completed within six months of the date of this decision. The parties shall file a joint report every 60 days advising the Court of the status of the proceedings on remand.

The Court will retain jurisdiction over the case during the course of the proceedings on remand. The Court **STAYS** proceedings in the instant case during that time.

Pursuant to RCFC 52.2(e), the parties shall file notice with the Court within 30 days of the Board's decision on remand stating whether that decision affords a satisfactory basis for the disposition of the case and whether the parties require further proceedings before the Court.

The Clerk is directed to serve a copy of this Opinion and Order upon the Board at the following address:

> Deborah F. Davidson, Executive Director
> Air Force Board for Correction of Military Records
> SAF/MRBC
> 3351 Celmers Lane
> Joint Base Andrews NAF Washington, MD 20762-6435

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge